```
                                                                USDC SDNY
                                                                DOCUMENT
                                                                ELECTRONICALLY FILED
UNITED STATES DISTRICT COURT                                    DOC #:_____
SOUTHERN DISTRICT OF NEW YORK                                   DATE FILED:  11/21/2014
```

------------------------------------------------------------X
  CMF INVESTMENTS, INC.,                           :
                                                   :
                             Plaintiff,            :
                                                   :         13-CV-475 (VEC)
                  -against-                        :
                                                   :         OPINION & ORDER
  DARRELL PALMER,                                  :
                                                   :
                             Defendant.            :
------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

      By outward appearances, this is a routine contract case. Plaintiff CMF Investments, Inc. ("CMF" or "Plaintiff") and Defendant Darrell Palmer ("Palmer" or "Defendant") entered into a Stock Purchase Agreement (the "SPA"), dated December 14, 2012, for the sale of ten million shares of Spare Backup, Inc. ("SPBU"), a thinly-traded "penny stock," in exchange for a $10,000 cash payment. Pl. Ex. 1. When Plaintiff only received four million shares of SPBU after the time for performance had expired, it brought this breach of contract action seeking specific performance with regards to the additional six million shares or, alternatively, damages equal to the market value of those shares on January 22, 2013. Compl. ¶¶ 34-49. Plaintiff touts the sanctity of contract and argues that it was at all times ready willing and able to uphold its end of the bargain and pay for the shares when they were delivered.[1] CMF claims that Palmer breached the contract when he failed to deliver the remaining six million shares. Tr. 178, 190-91.[2] Palmer, in contrast, professes to be baffled by the lawsuit because he claims he was merely an

---

[1]    Plaintiff never actually tendered the payment; it simply asserted it would do so if Palmer transferred the shares.

[2]    Citations to the transcript of trial will be cited as "Tr."

1

accommodation party for a deal between CMF and the CEO of SPBU (whom Palmer claims was the real party in interest of the deal with CMF). Def. Mem. at 1-2 (Dkt. 50). According to Palmer, he did not complete the transaction because both parties told him the deal had been called off. Def. Ex. 5. Despite email traffic that reflects a meeting of the minds that the contract had been terminated and that the four million shares that had been transferred would be returned to Palmer, *see* Def. Ex. 6, Plaintiff argues that termination was not effective because it did not comply with the formalities of termination set forth in the contract, Tr. 180, 196-97.

The Court held a one-day bench trial on May 16, 2014, and heard testimony from Carla Hohenhouse, the sole officer and shareholder of CMF, Tr. 4-115, and Palmer, Tr. 116-176. During oral argument, Plaintiff's counsel conceded the obvious: there may have been more to the overall deal than what appeared on the face of the contract. Nevertheless, he argued that facts extraneous to the contract between CMF and Palmer were irrelevant because the contract was signed and enforceable. Tr. 180-83. The Court disagrees. Plaintiff's testimonial attempts to provide a legitimate explanation for dubious communications between herself and Perle were not credible, *see* Tr. 56-59, and the Court will not provide judicial imprimatur to an arrangement the goal of which the Court, as the trier of fact, finds was unlawful. Judgment is therefore entered for Defendant. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law.

## I. LEGAL STANDARD

CMF claims that Palmer breached the SPA by not delivering ten million shares of SPBU to CMF's brokerage account within ten business days of the date the SPA was executed. Palmer claims that his performance was excused because the parties agreed to terminate the agreement

in email exchanges between December 24 and 26, 2012.[3]  Alternatively, Palmer claims that the SPA is unenforceable against him because it was a cog in a scheme designed to achieve an improper purpose.  Def. Proposed Findings of Fact at 1 ("Palmer Brief," Dkt. 42).[4]

To prevail on a claim for breach of contract under New York law, which the parties specified governs the SPA, CMF must establish "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996).  The parties do not dispute the existence of the SPA or that Palmer did not tender full performance of his obligation under the SPA.  It is also undisputed that CMF did not tender full performance either.  It partially performed in a way that was directly proportionate to Palmer's performance.[5]  Oddly, the partial performance by CMF occurred *after* CMF had agreed, in a December 26, 2012, email to Palmer, to return the shares CMF had received.  Def. Ex. 9.  CMF argues, however, that it revoked its agreement to unwind and that the agreement to unwind was not enforceable because it did not comply with the formal requirements of the SPA, Pl. Post-Trial Mem. at 5.  CMF also attests that it was at all times ready and willing to complete its performance – but only after Palmer fully performed.[6]  As for damages, CMF claims that it would have sold the remaining shares of stock

---

[3]   Typical business practices do not count Christmas Day as a "business day," therefore the deadline for performance was December 31, 2012.

[4]   Palmer's proposed findings of fact claimed that "[t]he whole thing was [SPBU's] way of getting [him] some Christmas money and paying for stock promotion." Palmer Brief at 1.  Although Palmer withdrew that allegation at trial, Tr. 170-71, the evidence presented supports his original characterization of the facts.  "[I]llegality may bar recovery even though the defense has not been pleaded."  *Dodge v. Richmond*, 10 A.D.2d 4, 16 (1st Dep't 1960), *aff'd,* 8 N.Y.2d 829 (1960).

[5]   Plaintiff paid Palmer $4,000 on December 31, 2012, representing 40% of its obligation under the SPA, after receiving four million (or 40% of the total) shares on December 24, 2012.  Tr. 21.

[6]   The SPA did not require Palmer's performance as a condition precedent to CMF's tendering of payment.

3

covered by the SPA for a significant profit, and seeks damages measured by the market price during the period immediately after the shares were to be delivered.[7]

Even if Plaintiff had met its burden of proving that the agreement was not terminated, that CMF adequately performed its obligations under the contract, that Defendant breached the contract, and damages, however, a contract is unenforceable under New York law if the finder of fact concludes that the agreement was made "with corruption and fraud contemplated as its purpose." *Dodge v. Richmond*, 10 A.D.2d 4, 16 (1st Dep't 1960), *aff'd*, 8 N.Y.2d 829 (1960). It is well-settled that illegal agreements are void. *Stone v. Freeman*, 298 N.Y. 268, 271 (1948) ("It is the settled law of this State . . . that a party to an illegal contract cannot ask a court of law to help him carry out his illegal object . . . ."). "[E]ven where a contract is not itself unlawful, the bargain may still be illegal [and unenforceable] under New York law if it is closely connected with an unlawful act." *United States v. Bonanno Organized Crime Family of La Cosa Nostra*, 879 F.2d 20, 28 (2d Cir. 1989) (citing *Contemporary Mission, Inc. v. Bonded Mailings, Inc.*, 671 F.2d 81 (2d Cir. 1981)). But "[c]onnection is a matter of degree," and "[t]here must be at least a direct connection between the illegal transaction and the obligation sued upon." *McConnell v. Commonwealth Pictures Corp.*, 7 N.Y.2d 465, 471 (1960). Because strong public policy favors freedom of contract, illegalities that are merely incidental to the contract sued on will not void the entire agreement. *New England Mutual Life Ins. Co. v. Caruso*, 73 N.Y.2d 74, 81-82 (1989); *McConnell*, 7 N.Y.2d at 471. When "the illegality is central to or a dominant part of the plaintiff's whole course of conduct in performance of the contract," however, the plaintiff cannot

---

[7] The Complaint also sought specific performance. The Court credits Palmer's testimony that he no longer possesses the 6,000 shares of SPBU. *See* Tr. 149.

recover because the courthouse doors are closed "to those who sue to collect the rewards of corruption." *McConnell*, 7 N.Y.2d at 469, 471.

## II.     FINDINGS OF FACT

CMF has been operating as an investment company since 2005, investing primarily in convertible promissory notes and convertible debentures.  Tr. 35.  In June 2012, Hohenhouse was introduced to Cery Perle,[8] the CEO of SPBU, by David Miller, an investor with an investing strategy similar to CMF.  Tr. 39, 44.  Between June and November 2012, Hohenhouse and Perle discussed CMF purchasing shares of SPBU through a private stock purchase agreement, with the shares originating from converted debentures rather than from the open market.  Tr. 39-40. Hohenhouse testified that Perle was seeking buyers like CMF for the sole purpose of ridding old debt from SPBU's balance sheet and compensating holders of old debt for the amounts due to them.According to Hohenhouse, when she heard of SBPU's debt converting activity her investment savvy alerted her to a profitable opportunity.  Tr. 36.  The Court does not credit Hohenhouse's explanation on this point.  The explanation simply cannot be squared with the contemporaneous email traffic between Hohenhouse and Perle, Def. Ex. 11, or with the overall economics of the transaction.

The SPA at issue here is the third such agreement CMF attempted to consummate to acquire shares of SPBU; Hohenhouse testified that the first two fell through because Perle "disappeared" before the agreements could be executed.  Tr. 39-40.  Palmer, an attorney who had done legal work for Perle and SPBU, was the holder of some of SPBU's "old debt," including the convertible debentures that were converted to the shares that he contracted to sell.  Tr. 73,

---

[8]     Perle has been found liable for securities law violations in the past.  *See Waldron & Co., Inc.*, S.E.C. Release No. 16146 (May 14, 1999) (announcing the judgment in the Securities Exchange Commission's action against Perle).

117-18; Pl. Ex. 1 at 1. On December 14, 2012, Hohenhouse and Darrell Palmer signed the SPA and agreed that Hohenhouse would pay Palmer $10,000 in exchange for 10 million shares of SPBU. Pl. Ex. 1 at 1. Palmer would obtain the shares by converting two convertible debentures, each with a face value of $5,000, into shares of SPBU common stock.[9] Consistent with Palmer's position that Perle was the real party in interest, Perle was an additional signatory to the SPA, which purported to be between CMF and Palmer, and Perle took an active role in negotiating the transaction with Hohenhouse. Pl. Ex. 1 at 6; Tr. 42-43. Palmer played virtually no role. Tr. 42-43. The Court credits Palmer's testimony that he was an accommodation party for a transaction that was between CMF and Perle. *See* Tr. 137-38, 146-48, 170; Palmer Brief at 1.

Palmer testified that SPBU owed him approximately $1 million in legal fees, which he had been carrying largely in the form of convertible debentures for over a year. Tr. 117-18, 135-36. He testified that he was uneasy converting the debentures and selling the shares himself on the open market given his relationship with SPBU as its former counsel, but he was in need of "Christmas cash." Tr. 128, 173. Perle reported to Palmer that this transaction had been sanctioned by James Schneider, another of Perle's attorneys who specialized in advising small companies on SEC and stock-related matters. Tr. 172-73, 207. That assurance assuaged Palmer's concern with regards to selling his shares in a private transaction. Tr. 172-73, 207. According to evidence introduced by Plaintiff, SPBU was trading for approximately $0.019/share when the SPA was executed. *See* Pl. Ex. 8. Thus, on the open market, Palmer's shares were worth approximately $190,000, compared to the $10,000 he would be paid under the SPA. Nevertheless, and notwithstanding the substantial debt allegedly due him from SPBU,

---

[9] At the time, SPBU was trading at $0.0019 per share. Pl. Ex. 8.

6

Palmer signed the SPA negotiated between Perle and Hohenhouse and agreed to sell stock that he purportedly owned free and clear at a discount of approximately 95%.[10]

The SPA provided that Palmer would deliver the shares to CMF within ten business days of December 14, 2012. Pl. Ex. 1 at 2. Hohenhouse testified that her brokerage firm would not deposit shares into her account without an attorney's opinion, *inter alia*, that the shares had been properly issued and paid for. Tr. 19, 44-45. On December 17, 2012, Hohenhouse sent her attorney a package of documents to obtain his opinion regarding the shares of SPBU; her attorney then sent his opinion along with the documentation to the brokerage firm as proof that CMF had legal title to the shares. Tr. 44-45.[11] One of the documents Hohenhouse sent her attorney was a photocopy of a check made payable to Palmer in the amount of $10,000, purportedly proving payment-in-full for the shares. Tr. 19, 46. Hohenhouse testified that the check was *never actually delivered* to Palmer, a fact she did not disclose to her attorney. Tr. 46.[12] Hohenhouse testified that she did not send Palmer the check because Perle (not Palmer) instructed her to pay for the shares with a wire transfer. Tr. 19, 50-51.[13] The brokerage firm deposited four million shares[14] of SPBU into CMF's account on December 24, 2012, before CMF had paid for them, based on Hohenhouse's false representation to her attorney (and the

---

[10] Although Palmer testified that he believed the SPA was above board when he entered in to the contract, the Court does not credit his professed ignorance about the real purpose of Perle's arrangement with Hohenhouse.

[11] The shares were transferred through a "DWAC," or Deposit/Withdrawal at Custodian, which is a method of electronically transferring shares without exchanging a physical stock certificate. Hohenhouse was unable to explain why, given her apparent mistrust of Perle, the transaction was not set up so that there would be an escrow closing. *See* Tr. 47.

[12] Hohenhouse, a sophisticated businesswoman, had no explanation why a check that remained in her possession was proof of anything. Tr. 47-48, 50-51.

[13] The SPA did not specify a method of payment. *See* Pl. Ex. 1.

[14] The 4 million shares represented the shares associated with one of the $5,000 convertible debentures. The second $5,000 debenture was worth 6 million shares. Pl. Ex. 1 at 1.

brokerage firm) that the $10,000 check was payment for the shares.  Tr. 22, 49, 50, 53.  Hohenhouse testified that she told Perle "from the beginning" that she would not pay for the shares until they were in CMF's brokerage account, despite her full knowledge that her brokerage firm required the shares to be paid for prior to deposit.  Tr. 48-49.

The plan went off the rails when the balance of the ten million shares did not "hit" CMF's account by the date Perle indicated they would, and Hohenhouse saw an email from Perle to David Miller stating that Perle did not "DWAC" the remaining six million shares as he had promised.  *See* Def. Ex. 11.  The email traffic that followed made it clear that Perle, not Palmer, was the real party in interest; that, pursuant to her agreement with Perle, Hohenhouse had two compatriots waiting in the wings to take action relative to the shares once she received them; and that, whatever this transaction really was about, it had nothing to do with getting old debt off of SPBU's balance sheet.

On December 24, when the six million shares from the second debenture had not been deposited into CMF's brokerage account, Hohenhouse emailed Perle – NOT Palmer – to raise concerns.  She wrote:

> Cery,The last time we spoke you said both dwacs would be done today.  Only one hit.  YOU said, when both hit then I could do the wire.
> I don't wire until stock hits.  Now you see why.  I will immediately pull the plug and don't you EVER contact me again.  I have held these guys off and kept them from making money for two weeks waiting for you to get your [act] together . . . .  You put 4 million shares in my account and expect me to wire you 10,000 and you want to be paid in full but yet you rip me on the number of shares . . . .  Go find somebody else to work your deal.

E-mail from Carla Hohenhouse to Cery Perle (Dec. 24, 2012 at 20:01:06) (Def. Ex. 11 at 9).[15]

---

[15]   That email does not jibe with Hohenhouse's testimony that the sole purpose of this deal was to get debt off of SPBU's balance sheet.  After all, even assuming anyone would go through these machinations to get $10,000 in debt off of a corporate balance sheet, that goal was achieved as soon as Palmer converted his debentures to shares.

Hohenhouse testified that the "guys" she referred to were two people who posted on message boards whom she knew only through Internet monikers. Tr. 80. She testified that, as a favor to Perle, she intended to pay them around $200 to post to an investment forum when SPBU made some unspecified announcement, because Perle was concerned the news would be overlooked by investors due to the holiday season. Tr. 57-58, 75-77, 80-81.[16] Hohenhouse testified that her "guys'" planned activity had nothing to do with her reasons for purchasing SPBU stock. Tr. 58.

Further email confirmed that Perle was the real party in interest to the transaction with CMF. Approximately 40 minutes after Hohenhouse's first email, apparently having received an email from David Miller at Harllon Holdings in the interim, Hohenhouse emailed Perle again:

> I told you I had everything under control. I told you that letting the guys go on Thursday was not a problem. We discussed payment and you agreed that once both dwacs hit I would wire the money.
>
> One hit for 4 million[,] the other one did not. Then, David copied me on an email you sent to him stating glad we didn't dwac the balance.
>
> I told you this was the third time that I put together a package for you if it didn't go through this time I was not wasting anymore [sic] time with you. My guys have been incredibly patient sitting on the sidelines for two weeks now not working. Waiting for this deal to happen.
>
> I don't play. Either you want this to happen or you don't. The bottom line is time is money. Your time is not the only valuable time. My guys['] . . . time is valuable too and so is mine and so is David's[.]
>
> I have already sent a message to my guys and told them to pull the plug. *I will send you back **your** stock Wednesday*. I'm sure David will be more than happy to help you find somebody else [to] work the deal[.]

E-mail from Hohenhouse to Perle (Dec. 24, 2012, at 20:44:43) (Def. Ex. 11 at 8-9) (emphasis added).

---

[16] Hohenhouse herself was barred from making any posts on these message boards. Tr. 57.

That email triggered a response from Perle indicating the DWAC was ready and would have been delivered that day except that the transfer agent did not have the certificate. Def. Ex. 11 at 9 (email from cperle@spbu.com to chohenhous@aol.com, dated December 24, 2012, at 11:29 p.m.). Perle directed Hohenhouse to "apologize or send back the shares," *id.*, a reaction that is, again, wholly at odds with Hohenhouse's explanation that this transaction was a simple stock purchase agreement with the sole purpose of ridding SPBU's balance sheet of old debt, but it is entirely consistent with Palmer's testimony that the real agreement was between Perle and Hohenhouse.

>Approximately 30 minutes later, Hohenhouse responded to Perle:
>
>My guys are/were lined up for the next two weeks. I backed them off from starting Wednesday as per your request. . . .
>
>Everything has been good and ready to go on my side. Have just been waiting on stock to clear. I have told you several times, we don't start and I don't wire until shares hit. I'm not paying the full amount for the shares until the full amt of shares hit. Told you I learned my lesson a long time ago. Also told you my guys are already paid out, just waiting for the word from me to start. . . .
>
>I told you when the stock clears I would cancel the check and initiate a wire instead. All my paperwork shows I wrote a check. I was willing to go back and change that PER YOUR REQUEST. I have done everything that you have asked. My guys have been on standby for two weeks. . . .
>
>Anyway bottom line I cannot continue to have my guys sitting there not working . . . as a favor to me. And I cannot continue spending time on this project if we are not moving forward. . . .
>
>I've already sent a message to my guys to move on. I was supposed to go to TN Wednesday for a merger I am facilitating. I cancelled that trip so I could be around to make sure everything went ok on your project. This is business. I'm damn good at what I do and yes, my time has value too. I'm not keeping my guys sitting around doing nothing . . . .
>
>I'm sure David will be more than happy to help you and *I will gladly return the stock first thing Wednesday morning*. . . .

10

> If you get the dwac done this week and if you still want to work with me, I will do the wire the minute the stock hits my account and I will get my guys back on it for NEXT week.
>
> If you don't want to work with me that's fine too. . . .
>
> *Please let me know as soon as possible if you want me to send the stock back.  I will get it done first thing Wednesday.*

E-mail from Hohenhouse to Perle, dated (Dec. 25, 2012, at 12:39 a.m.) (Def. Ex. 11 at 7-8) (emphasis added).

Approximately 12 hours later, Perle emailed Hohenhouse a copy of a series of messages they had exchanged on December 21, 2012, in which Perle had verified with Hohenhouse that her broker had received the four million shares and indicated that Perle was trying to have the additional six million shares released, but that the shares could not be released until Monday (presumably, Monday, December 24) because SPBU was still in possession of the stock certificate.  E-mail Perle to Hohenhouse (Dec. 25, 2012, at 11:31 a.m.) (Def. Ex. 11 at 5-6). During that exchange, Perle stated, "lets [sic] start Thurs[day][,] not Wed[nesday]." *Id.* Hohenhouse confirmed that some shares had arrived, and Perle pressed again "lets [sic] do this on Thurs[day]." *Id.*  Hohenhouse responded, "[N]o prob[lem.]  [M]y guys are good . . . they'll do whatever I ask." *Id.*  Perle then repeated that the other 6 million shares would arrive Monday, at which point Hohenhouse should wire "DP" (presumably Darrell Palmer). *Id.*

A few hours later, at 5:15 pm on December 25, 2012, Hohenhouse sent Perle another lengthy email regarding the transaction.  *See* Def. Ex. 11 at 3-4.  The email confirmed the series of messages exchanged on December 21, and then relayed the facts as they had occurred from her perspective:

> Last night, I checked my emails and David had forwarded me the email communications between the two of you. The last email, came from you and stated "glad we didn't dwac the balance".

11

> I have consistently told you that I am not giving the word to "go" until all of the stock clears. I have consistently told you that I would pay once the stock clears.
>
> In order to get the dwac approved by compliance for deposit, a person must show proof of payment. I wrote a check and had planned to mail the check to Darrell. Then, I spoke with you and you asked me to cancel the check and do wire transfer instead. You then sent me the wiring instructions for Darrell.
>
> Look at Skype, you wrote "Monday the other 6 and THEN wire DP". We were on the same page. You suggested starting Thursday rather than Wednesday. I agreed. Again, we were on the same page.
>
> I don't know what the problem is or was. . . .
>
> Your statement to David which said "glad we didn't dwac the balance" indicates to me that the other 6 was not sent. Ok, so why would you be sitting there anticipating or expecting me to initiate a wire? . . . .
>
> I cannot keep these boys on hold forever . . . . When I take the time to put these packages together, it takes me away from other projects. When I line these guys up and ask them to do me a favor and just sit tight until all the paperwork is done and stock has cleared, that takes them away from being able to work on other projects . . . .
>
> Now, if you want me to help you, fine . . . . I am NOT starting until the stock CLEARS and I am NOT wiring funds until the stock CLEARS. If that is not acceptable, then that's ok too. *Like I said, I will be more than happy to send you back the shares and just move on . . . .*
>
> I don't dump into my own efforts . . . . I know what it's like to be in your shoes . . . . Wasting my time and pulling the plug at the last minute or expecting me to do things I have clearly told you repeatedly I would not do is showing total disregard and disrespect for me and my guys . . . .
>
> I want to help you and I KNOW I can help you. I'm just simply not willing to continue to put other projects on hold . . . .
>
> *If I don't hear from you in the a.m. I will just go ahead and instruct my broker to return the shares.* I will draft a mutual rescission for Darrell to sign and we all just move on.

E-mail from Hohenhouse to Perle (Dec. 25, 2012 at 5:15 p.m.) (Def. Ex. 11 at 3-5) (emphasis added).

After a few more exchanges, Perle threw in the towel: "At this point please return the shares[.] [T]his is not the way I do business . . . ." E-mail from Perle to Hohenhouse (Dec. 25, 2012 at 8:44 p.m.) (Def. Ex. 11 at 2).

After receipt of another lengthy email from Hohenhouse indicating that her role in the transaction was complete, Perle sent Hohenhouse an email inquiring: "[W]hen do I get *my* shares back?" E-mail from Perle to Hohenhouse (Dec. 25, 2012 at 11:21 p.m.) (Def. Ex. 11 at 1) (emphasis added). Hohenhouse's response was entirely consistent with the view that she and Perle were the real parties to the transaction: "I will call the broker in the a.m. and find out what needs to be done . . . . I'm not going to respond to anymore [sic] of your emails . . . . I will let you know as soon as I know, when Darrell can expect his stock back." E-mail from Hohenhouse to Perle (Dec. 25, 2012 at 11:35 p.m.) (Def. Ex. 11 at 1).

Consistent with her email correspondence with Perle, Hohenhouse testified that she never negotiated any part of the SPA with Palmer. Tr. 42.

Perhaps because Hohenhouse wanted no further dealings with Perle, she contacted Palmer directly on December 26, 2012. Def. Ex. 9 at 3. In that email, Hohenhouse asked Palmer "[to] please give [her] a call to discuss the transaction [of SPBU stock] and the payment thereof." E-mail from Hohenhouse to Palmer, Dec. 26, 2012 at 9:16 a.m.) (Def. Ex. 9 at 3). At that point, CMF was in possession of four million unpaid-for shares of SBPU stock that Hohenhouse had acquired from Palmer through false representations to her attorney and broker. Tr. 46, 71. Palmer replied: "I'm on my cell – call me anytime." e-mail from Palmer to Hohenhouse (Dec. 26, 2012, at 9:26 a.m.) (Def. Ex. 5 at 1). Palmer also forwarded Hohenhouse's email to Perle, and Perle promptly responded: "Please send her an email saying that you understand the deal is off and you would like the 4 million shares transfer [sic] back to the transfer agent[.] If there are

13

any questions please contact Cery [Perle]." E-mail from Perle to Palmer (Dec. 26, 2012, at 9:35 a.m.) (Def. Ex. 5 at 1).

As instructed by Perle, Palmer emailed Hohenhouse: "I talked to Cery, apparently things have changed and our deal is no longer moving forward. Please return the 4M shares to the transfer agent." E-mail from Palmer to Hohenhouse (Dec. 26, 2012, at 9:35 a.m.) (Def. Ex. 9 at 2). Hohenhouse responded: "No problem. Can you please draft a mutual rescission." E-mail from Hohenhouse to Palmer (Dec. 26, 2012, at 9:38 a.m.) (Def. Ex. 9 at 2). At a time when she had not yet performed her part of the bargain and even though she had agreed with Perle that she would return to Palmer the shares of SPBU that she had already received, Hohenhouse had her attorney email Palmer on December 27 stating that he had been "retained to represent CMF in connection with the SPBU deal" and that, based on his preliminary review, the SPA could not be unilaterally rescinded by Palmer or by Perle and therefore his client expected the SPA to be fully performed. E-mail from Uretsky to Palmer (Dec. 27, 2012, at 9:53 a.m.) (Def. Ex. 8).

Palmer then replied to the last email Hohenhouse sent him on December 26 requesting that Palmer draft a mutual rescission agreement: "You want a formal document?? Can't we just confirm by this email that the stock sales [agreement] is cancelled by mutual agreement[?] . . . . Please return the stock cert[ificate] to the transfer agent." E-mail from Palmer to Hohenhouse (December 27, 2012, at 1:41 p.m.) (Def. Ex. 9 at 1). Hohenhouse directed Palmer to refer all future correspondences to her attorney. E-mail from Hohenhouse to Palmer, (December 27, 2012, at 1:53 p.m.) (Def. Ex. 9 at 1).

On December 31, 2012, Perle forwarded his and Hohenhouse's email correspondences to Palmer and stated: "We need to discuss this so you can send a brief 1 or 2 paragraph to [Hohenhouse's] [attorney] to get shares back ASAP[.]" E-mail from Perle to Palmer (Dec. 31,

2012, at 9:36 a.m.) (Def. Ex. 11 at 1).[17] Also on December 31, 2012, Hohenhouse sent Palmer a $4,000 wire transfer, purportedly representing a prorated amount for the percentage of the total shares covered by the SPA that CMF had actually received. Tr. 21-22; Def. Ex. 13 (email from Palmer to Perle dated January 3, 2013, at 2:16 p.m.). According to her own testimony, on December 31, 2012, Hohenhouse promptly began "dumping" the shares on to the market ultimately profiting approximately $40,000 from her $4,000 investment. Tr. 53, 66, 113; Def. Ex. 17. Hohenhouse sold the shares despite the unrefuted evidence that there was a clear meeting of the minds between Hohenhouse and Perle and between Hohenhouse and Palmer that the deal was off and Hohenhouse would be returning the four million shares to Palmer.

Because Hohenhouse's testimony lacked any credibility, the Court cannot definitively determine exactly what this transaction was intended to accomplish – but it bears all of the earmarks of a "pump and dump" scheme.[18] According to the email traffic, Hohenhouse's "guys" had been on standby at least since the execution of the SPA, ready to start doing something that would make all of the parties, including themselves, a profit as soon as the stock cleared CMF's account and Hohenhouse gave the "go." Def. Ex. 11 at 3-4, 6. Moreover, it was clear that those "guys" would not begin their part of the transaction (presumably talking up SPBU to other

---

[17] To state the obvious, Perle's machinations to retrieve the shares belies Hohenhouse's testimony that this transaction was simply a legitimate effort to rid SPBU's balance sheet of $10,000 worth of old debt.

[18] Hohenhouse maintained that she invested her money in SPBU over other investment "projects" as a favor to Perle (a person she had only recently been introduced to for the purpose of purchasing convertible debentures) to get old debt off of SPBU's books. She testified that the "guys" she referred to in her emails were people who would post information on investment news forums; that she engaged "the guys" as a favor to Perle and paid them nominal sums out of her own pocket; and that the posting of this elusive "news" was unrelated to her desire to purchase shares of SPBU. Tr. 57-58, 101-05, 111-12. Her testimony left many gaping questions to which Hohenhouse was unable to provide cogent answers. *See* Tr. 93-94. For example, why insist that the shares clear her brokerage account before having her "guys" post public news in public bulletin boards as a favor? *See* Tr. 100-03, 108-10. Further, why did she repeatedly tell Perle that these "guys" were "hanging out" for two weeks foregoing other opportunities to make money for a measly $200 from a person who only knew them by their online monikers and when all they were going to do was post a news announcement on a bulletin board? Tr. 58, 75-76, 79-84, 93-94, 101.

investors) until Hohenhouse was satisfied that she had all 10 million shares. *Id.* Hohenhouse's explanations were so clearly incredible that the only logical conclusion the Court can draw is that the actual purpose of the transaction was to effectuate a "pump and dump" scheme or some similarly improper money-making scheme. There is no other reasonable explanation for a transaction that made no sense economically for Palmer and for Hohenhouse's transparently false testimony regarding the purpose of the transaction and its associated arrangements.

### III.   CONCLUSIONS OF LAW

*First*, the Court finds that the emails exchanged between Perle and Hohenhouse are relevant to determining whether the SPA is enforceable even assuming Perle was not technically a party to the contract. Plaintiff's post trial brief focuses on the four corners of the contract and argues that because the SPA was unambiguous on its face, extrinsic evidence is not admissible to interpret the terms of the contract or the intent of the parties. Pl. Post-Trial Mem. at 5 (Dkt. 48). This rule of contract construction is an application of the parol evidence rule; the parol evidence rule, however, does not prevent the Court from considering evidence that shows an unambiguous contract is illegal. *Kidder, Peabody & Co., Inc. v. IAG Int'l Acceptance Grp. N.V.*, 28 F. Supp. 2d 126, 140 (S.D.N.Y. 1998).

*Second*, the Court finds that Perle was the puppet master pulling the strings of this deal. Hohenhouse was introduced to Perle for the specific purpose of engaging in this sort of converted debenture share purchase agreement. The SPA that CMF seeks to enforce against Palmer was the third such agreement Hohenhouse attempted to consummate with Perle; any interaction she had with Palmer was strictly through Perle until after the SPA was executed and after her relationship with Perle soured. Hohenhouse admitted that she saw Perle as having the authority to dictate important terms of the agreement, and her email correspondence with Perle made clear her understanding that the SPA rose or fell at Perle's discretion, *not* Palmer's.

*Third*, the Court finds that the SPA was one piece of a grander scheme between Hohenhouse and Perle, not a run-of-the-mill contract as Plaintiff insists, and that Palmer was an accommodation party who transferred shares of SPBU to CMF as compensation for the services CMF was to render pursuant to that scheme.  Although it is not clear beyond all doubt what Perle stood to gain from his arrangement with Hohenhouse and her "guys," it is clear that Palmer, who is not likely the naïf he portrayed himself to be, sold his shares in SPBU for an amount that was significantly, and inexplicably, less than what he could have obtained on the open market.  It is also clear that Hohenhouse and Perle had a more extensive arrangement than what was revealed at trial, and that Hohenhouse viewed Palmer's tendering of all ten million shares as a condition precedent to whatever service she would deliver, through "her guys," for SPBU and Perle.  In a single conversation, Perle confirmed CMF's receipt of the four million shares, directed Hohenhouse to wire Palmer the $10,000 after she received the remaining six million shares, and coordinated the timing for her "guys'" activities.  That exchange undermines Hohenhouse's attempt to provide a legitimate explanation for her emails – that her "guys" were "sitting around" for two weeks waiting for Perle to release a news item about SPBU and that this side arrangement was wholly unrelated to her interest in the shares – because Perle gave her a date certain to begin performance.  Several other communications also expose the relatedness of the "guys'" performance to Hohenhouse's interest in receiving the full ten million shares.

*Fourth*, the Court finds that the SPA is void and unenforceable because the parties – or, at the very least, Hohenhouse and Perle – entered in to the agreement with the intent to accomplish an illegal purpose.  Although the SPA is lawful on its face and it appears that Hohenhouse called off her "guys" before they tendered any performance, to give CMF the relief it seeks would permit Hohenhouse to profit from her own illegality.  She seeks damages measured by the

17

market price at the time for the SPA's performance. Hohenhouse's SPA with Palmer was not the only such agreement that Perle arranged; Hohenhouse knew that David Miller had entered similar arrangements with SPBU and Perle in the past and told Perle that he would have to resort to Miller's help to accomplish his ends. Def. Ex. 11. Palmer then sold the six million shares Hohenhouse now sues upon to Miller for $6,000 in January 2013, Tr. 120-21, presumably as part of a similar arrangement facilitated by Perle. Rather than returning the four million shares she had received (based on the fraudulent information provided to her brokerage firm) as she had told Palmer she would do, Hohenhouse retained a lawyer, purported to rescind her agreement to terminate the SPA, and wired Palmer $4,000 as compensation for the four million shares. She then took advantage of the situation and, on the same day that she wired the money, began "dumping" SPBU shares for a profit that was almost 100 times her original investment.

Not satisfied with that windfall, CMF brought this claim to the courthouse doors to reap the remainder of its illicit reward.[19] It would be entirely against public policy for the Court to grant CMF damages for breach of a contract that was intended to facilitate illegal activity, even if the rest of the arrangement was abandoned. Because there is a "direct connection between the illegal transaction and the obligation sued upon," CMF will be denied recovery even though the SPA appears valid on its face. *McConnell*, 7 N.Y.2d at 471.

Because an illegal contract is void and unenforceable, the Court need not consider whether the parties agreed to terminate the contract or the adequacy of either party's performance. It is beyond argument that "a party to an illegal contract cannot ask a court of law to help him carry out [her] illegal object," and that no court will "serve as paymaster of the

---

[19] The Complaint also sought specific performance. Hohenhouse does not explain the legal basis for suing Palmer for specific performance or for contractual damages for breach, when she only partially performed the SPA herself.

wages of crime." *Stone v. Freeman*, 298 N.Y. 268, 271 (1948). Plaintiff's invocations of the sanctity of contract notwithstanding.

## IV. CONCLUSION

For the reasons set forth above, the Clerk of Court is directed to enter judgment for the Defendant and terminate this case.

Because Palmer did not come to the Court with entirely clean hands himself, Defendant's request for sanctions is DENIED. *See generally Schlaifer Nance & Co., Inc. v. Estate of Warhol*, 194 F.3d 323 (2d Cir. 1999).

**SO ORDERED.**

Date: November 21, 2014      **VALERIE CAPRONI**
      New York, NY            **United States District Judge**